IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| SLASH F. CATTLE COMPANY, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v.  ) <br> ) <br> AGRIDYNE, LCC, d/b/a Mix 30, and ) <br> PLAINS STATES COMMODITIES, LLC, ) <br> d/b/a Mix 30, ) <br> ) <br> Defendants. ) <br> _____) | Case No. 23-1197-JWB-BGS |

## ORDER DENYING ON MOTION TO AMEND

Plaintiff moves the Court, over Defendants' objection, for leave to amend its pleading.  (*See* Doc. 112.)  The deadline to move to amend expired on February 21, 2024, almost 15 months before the present motion was filed.  Plaintiff contends, however, that "good cause exists to allow [it] to amend to assert a claim for punitive damages and add additional factual assertions due to information revealed about Mix 30 in discovery after that date." (Doc. 112, at 1.)  For the reasons set forth herein, Plaintiff's motion is **DENIED**.

## FACTUAL BACKGROUND

### I.     Procedural Background.

Plaintiff filed the present action in the District Court of Stafford County, Kansas, on June 26, 2023, alleging negligence, breach of express warranty, breach of implied warranty, strict liability, fraud, and negligent misrepresentation as a result of an allegedly toxic cattle protein supplement manufactured by Defendants.  (*See* Doc. 1-1.)  The state court Petition, which remains Plaintiff's operative pleading in this case, asserts claims for negligence, breach of warranties, strict liability, fraud, and negligent misrepresentation against Defendants regarding their Mix 30 liquid cattle protein supplement.  (*Id.*)  Plaintiff asserts Mix 30 is "toxic, defective, and misrepresented" and

1

caused "extensive injury and death to Slash F's cow/calf herd." (*Id.*) Defendants subsequently removed the case to federal court on September 13, 2023, on the basis of diversity jurisdiction pursuant to 28 U.S.C. §1332. (Doc. 1.)

The initial Scheduling Order entered in this case on November 6, 2023, included a motion to amend deadline of December 22, 2023. (Doc. 18, at 3.) Following a telephone conference with the parties on January 24, 2024, the motion to amend deadline was extended to February 21, 2024. (*See* 1/24/24 Docket entry resetting deadline.)

The deadline to amend and Plaintiff's "anticipated need to amend its complaint" have been the subject of two previous motions from Plaintiff. (*See* Doc. 48, 52, 82, and 84.) The first of these motions, Plaintiff's Motion to Amend the Scheduling Order (Doc. 48), was filed on May 6, 2024, and sought "significant revisions to the schedule, from the motion to amend deadline forward." (Doc. 49, at 1.) The Court held a hearing to discuss Plaintiff's request to extend various case deadlines and to reset the motion to amend deadline, which had passed more than two months prior. The Court granted the motion in part and extended various deadlines in the scheduling order; however, the undersigned denied the request to reset the motion to amend deadline. (Doc. 52.) The undersigned Magistrate Judge explained to Plaintiff that even though the motion to amend deadline would not be reset, Plaintiff was not precluded from filing a motion to amend, but would simply need to meet the standards under both Fed. R. Civ. P. 15 and 16 (discussed *infra*) given that the deadline to move to amend had expired.

The second motion was Plaintiff's "Motion for A New Deadline for Motions to Amend," filed on January 21, 2025. (Doc. 82.) In that motion, Plaintiff asked the Court to reset the motion to amend deadline to February 6, 2025, so that it could, "update Slash F's contentions with regard to the continuing damages to the herd, and to assert a claim for punitive damages." (Doc. 82, at 1.) During a January 21, 2025, telephone conference regarding this motion, the undersigned Magistrate

Judge denied Plaintiff's request and again advised Plaintiff that it was not going to reset a deadline that had passed a year prior and that if it wished to amend, it would need to establish the standards under both Fed. R. Civ. P. 15 and 16 for amending after the expiration of the deadline.

Plaintiff did not file the present motion to amend until May 9, 2025, approximately 3 ½ months later. (Doc. 112.) Therein, Plaintiff argues that

> information discovered after [Plaintiff's] deadline to amend, particularly that information revealed in the past 45 days [prior the filing of the motion], establish Defendants' concealment, and careless, willful and wanton disregard for their customers and the animals to which their toxic Mix 30 is fed. The foregoing facts establish the showing required by Rules 16 and 15 to grant this motion.

(Doc. 112, at 8.)

Defendants respond that despite the Court's instruction to Plaintiff in January 2025 to move to amend its Complaint, "Plaintiff delayed over three months in seeking leave to amend … ." (Doc. 123, at 2.) According to Defendants, "[n]otably, many of the allegations contained in the putative Amended Complaint and support the punitive damage claim mirror those that Plaintiff raised over a year ago in its Motion to Amend the Scheduling Order, clearly demonstrating that alleged facts on which Plaintiff bases its punitive damage claims are not newly discovered." (*Id.* (encouraging a comparison between Doc. 49, at 2–5 and Doc. 112-2, at 9–15, 21–23).) The facts relevant to Plaintiff's request are discussed immediately *infra*.

## II. "Newly" Discovered Facts Relating to Plaintiff's Request to Amend.

The factual basis for Plaintiff's motion relates to discovery regarding "reactive loads" of Mix 30. According to Plaintiff, "[t]he byproduct of a reactive load is ammonia, and ammonia toxicity is [Plaintiff's] treating veterinarian's primary diagnosis of the causes of the deaths and injuries to the [Plaintiff's] herd." (Doc. 112, at 3.) Plaintiff contends that during depositions of Defendant's corporate representative and witnesses in February 2024 (along with documents produced), it "learned for the first time that Defendants have no formula for Mix 30, that they have a history of

3

'reactive loads' of Mix 30, and that Defendants' manufacturing processes likely violate statutory feed requirements." (*Id.*)

In July 2024, Plaintiff also served a request to inspect Defendants' Holcomb, Kansas, plant to allow Plaintiff's experts to analyze and test the samples and complete their reports. (Doc. 55.) Plaintiff indicated it would "inspect the Plant and will take photographs and videos" while collecting "up to five (5) samples of the Mix 30 … from each of the Plant's tanks and possibly their associated piping used in the production of Mix 30." (*Id.*) The inspection occurred in August 2024 and resulted in Plaintiff sending Holcomb samples to an outside laboratory for "much more comprehensive testing than what was previously performed on samples of the Mix 30 purchased by [Plaintiff] that initially revealed the toxic level of ammonia." (Doc. 112, at 4.) Plaintiff admits the tests "revealed not only ammonia, but the presence of other toxins and bacillus harmful to cattle." (*Id.*) One of Plaintiff's subsequent expert disclosures in September 2024 "outlined [Defendant's] conscious failure to comply with a multitude of statutory, regulatory, and good manufacturing practices applicable to cattle feed." (Doc. 112, at 4.)

Plaintiff contends that based on this information, it "focused part of its discovery efforts on determining whether a basis existed for a punitive damages claim," resulting in written discovery and depositions "to learn about the existence of any reactive loads of Mix 30, the plants from which they originated, Defendants' investigation of reactive loads, the cause of the reactive loads, the testing done on reactive loads, the disposition of the reactive loads, the Defendants' efforts to warn their dealers and customers of reactive loads, and so on." (*Id.*) Although Plaintiff does not indicate when exactly it came to the decision to create such "focus," the Court surmises, based on the context of Plaintiff's factual summary, that this occurred sometime in the autumn of 2024.

Plaintiff deposed Curtis Masters, the manager of the Holcomb plant in October 2024, wherein Plaintiff contends it learned that Defendants "never advised" the Holcomb plant that it had

4

manufactured reactive loads "or that ammonia, toxins, or bacillus exist in the manufacturing tanks." (*Id.*, at 6.) According to Plaintiff, the plant manager "first learned of these reactive loads from [Plaintiff's] counsel after being presented with exhibits <u>during his deposition in October 2024</u>, indicating Defendants' concealment and careless, willful, and wanton disregard for their customers and the animals to which their toxic Mix 30 is fed." (*Id.*) Plaintiff continues that this deposition also revealed Defendants "have never emptied or cleaned the Holcomb manufacturing tanks since they were brought online in 2013, despite statutory and regulatory requirements" and that "sludge and remnants from another Kansas plant that was being shuttered were trucked to the Holcomb facility and placed in the Holcomb tanks in 2013 at the commencement of their operation." (*Id.*)

In <u>December 2024</u>, Plaintiff subpoenaed documents from Stafford County Flour Mill (hereinafter "the Mill"), Defendants' dealer from which Plaintiff purchased Mix 30. Plaintiff contends that the documents subpoenaed relate to a potential claim for punitive damages claim" as Plaintiff sought information regarding what Defendant told the Mill "about reactive loads, what to do to avoid them, what to do if it had a reactive load, what instructions or warnings it was given about them, what it was to disclose to Mix 30 customers about reactive loads, and the like." (*Id.*, at 6.) After extensive efforts at scheduling, Plaintiff set a deposition for a 30(b)(6) representative of the Mill on January 8, 2025. (Doc. 77.)

On January 6, 2025, two days before the Mill's 30(b)(6) deposition was to occur, defense counsel requested that the deposition be postponed and asked that Plaintiff "not oppose a motion to revise the scheduling order due to a personal health issue" of one of the defense attorneys. (*Id.*, at 6-7.) Following a telephone conference with the Court, a revised Scheduling Order was entered on January 21, 2025, extending deadlines for expert disclosures, the completion of discovery, the filing of dispositive motions, and resetting the Pretrial Conference deadlines. (Doc. 86.) Again, the motion to amend deadline was not reset.

5

Plaintiff also made attempts to depose Defendants' corporate representative "regarding the new documents provided in response to this discovery," which, despite various attempts at scheduling, did not occur until March 19, 2025. (*Id.* (citing Doc. 92).) According to Plaintiff, on that date, "only one hour and 41 minutes before the … deposition of Defendants' 30(b)(6) witness and part owner Pat Collins, Defendants made a large document production," including "massive spreadsheets, which collectively contain over 1250 rows, over 6100 columns, and over 84,000 cells" which "relate to testing and analysis done on reactive loads of Mix 30, testing for almost 1,000 organisms" (hereinafter referred to as "FERA testing"). (*Id.*, at 4-5.) According to Plaintiff, this information was responsive to the numerous document requests "seeking these test results dating back to January 4, 2024." (*Id.*, at 5.) Plaintiff continues that this document production also

> includes illumina 16S Metagenomics Reports, reflecting gene sequencing conducted on the Mix 30 reactive load samples to determine what organisms live in these loads. These documents directly support multiple facets of Slash F's punitive damages claim, including Defendants' knowledge of reactive loads, their failure to warn, and the unintended organisms existing in Mix 30 that are outside the product label.

(*Id.*)

Plaintiff contends that Defendants "are now making objections and resisting production of documents related to reactive loads, and the parties are engaging in discussions to determine" whether Plaintiff will need to involve the Court and potentially file a motion to compel. (*Id.*) Although Plaintiff believes this outstanding information "is likely to also support this motion to amend, [it] has elected to file the motion now, in part due to the Court's comments at the January 21, 2025 hearing." (*Id.*)

The aforementioned 30(b)(6) depositions of Stafford Mill's representatives were ultimately rescheduled for April 4, 2025, approximately one month before Plaintiff's present motion was filed. Plaintiff contends that it believed the Mill depositions were necessary to support its request to

amend the Complaint. (Doc. 112, at 7.) Plaintiff continues that the Mill depositions did, in fact, "reveal[ed] new, previously unknown information crucial to this motion." (*Id.*) For instance, according to Plaintiff,

> [t]he Mill 30(b)(6) depositions revealed that the Mill was never advised of the existence of reactive loads, or given any information, warnings, or instructions about how to prevent them. [Doc. 112-6, at 42-45.] Defendants now contend, as Defendants' corporate representative and owner Pat Collins testified [on] March 19, 2025[,] that reactive loads can be prevented by the monitoring of pH and adding acid to Mix 30 if necessary.8 [Doc. 112-4, at 58-62.] Although Collins testified that Defendants advised the dealer network of the need to monitor pH (he could not say when or how), the corporate representative of the Mill testified that Defendants had never provided any information on pH or the need to test for it. [Doc. 112-6, at 42-45.] Defendants also never provided any information to dealers or customers regarding their belief that mixing loads of Mix 30 with different pH levels is potentially the cause of reactive loads. [Doc. 112-4, at 95-96.]

(*Id.*)

Plaintiff argues that taking this information as a whole, which was discovered after the motion to amend deadline and including information discovered in the 45 days leading up to the filing of Plaintiff's motion, establishes "Defendants' concealment, and careless, willful and wanton disregard for their customers and the animals to which their toxic Mix 30 is fed." (*Id.*, at 8.) Plaintiff continues that these facts establish the requisite showing of "good cause" under Federal Rules of Civil Procedure 15 and 16 for allowing it to amend its Complaint past the deadline to do so. (*Id.*)

On the other hand, and as discussed in the legal analysis section, *infra*, Defendant opines that the vast majority of information upon which Plaintiff relies in support of its requested amendment was available to Plaintiff long before the present motion was filed. The Court will, therefore, analyze the information available to Plaintiff in the context of the Rule 16 "good cause" standard before engaging in a Rule 15 analysis, if necessary.

## ANALYSIS

**I.     General Legal Standard.**

As discussed above, the extended deadline to amend the pleadings in this case expired in February 2024, some 15 months prior to the filing of the present motion.[1] When a motion to amend a pleading is filed after the expiration of the Scheduling Order deadline to do so, a party seeking leave to amend must demonstrate good cause under Fed. R. Civ. P. 16(b)(4), then satisfy rule 15(a).  *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014).  "Rule 16(b)(4) governs modification of scheduling order deadlines.  Rule 15(a) governs the amendment of pleadings."  *Estate of Ferrell v. KB Custom Ag Servs. LLC*, 2024 WL 3890144, at *1 (D. Kan. Aug. 20, 2024).  The Court will therefore first address Rule 16 analysis.

> [T]he court will first determine whether the moving party has established 'good cause' within the meaning of Rule 16(b)(4) to justify allowing the untimely motion.  Only after determining good cause has been established will the court proceed to determine if the movant has satisfied the more lenient Rule 15(a) standard.

*Id.* (citations omitted).

**II.    Good Cause Under Fed. R. Civ. P. 16.**

Pursuant to Fed. R. Civ. P. 16(b)(4), a "schedule may be modified only for good cause and with the judge's consent."  "Good cause" under Rule 16(b)(4) requires the moving party to show that "despite due diligence it could not have reasonably met the amendment deadline."  *Livingston v. Sodexo & Affiliated Co.*, No. 11-4162-EFM, 2012 WL 2045292, at *1 (D. Kan. June 6, 2012) (citation omitted).  *See also Estate of Ferrell*, 2024 WL 3890144, at 1 (citation omitted).  Good cause under Rule 16 may be satisfied if moving party learns new information through diligent discovery efforts.  *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 990 (10th Cir. 2019) (citing *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1247 (10th Cir. 2015)).

---

[1] The Court also notes that it encouraged Plaintiff to move to amend the Complaint on more than one occasion, most recently in January 2025, some 3 ½ months prior to the motion being filed.

Plaintiff argues that good cause exists under Rule 16 to amend the Complaint beyond the deadline.  As discussed in the factual section, *supra*, Plaintiff contends that although it first learned of reactive loads in February 2024, additional information was learned during (and documents were provided by Defendants in conjunction with) depositions in the spring of 2025.  (*See* Doc. 112, at 9.)

Defendants counter that "even a cursory review of the record … makes it abundantly clear that Plaintiff was aware of the material allegations" forming the basis for the proposed amendment as a result of the February 2024 depositions, when Plaintiff learned "<u>extensive information regarding Defendants' manufacturing processes and 'reactive loads'</u>."  (Doc. 123, at 4 (emphasis added).)  Defendants continue that the August 2024 inspection of the Holcomb plant, Plaintiff's September 2024 expert disclosures, and October 2024 deposition of the Holcomb plant manager also gave Plaintiff a sufficient basis to move to amend.  (*Id.*, at 5-6.)

Defendants also point to Plaintiff's <u>May 6, 2024</u>, Motion to Amend the Scheduling Order – filed a year before Plaintiff moved to amend – in which Plaintiff stated that "[d]iscovery has revealed the existence of [potential] new claims[.]"  (*Id.*; *see also* Doc. 49, at 1.)  In the brief supporting that motion, Plaintiff frequently refers to its discovery of "reactive loads."  (Doc. 49, at 3.)  According to Defendants, Plaintiff's May 2024 motion

> contained many of the allegations that Plaintiff seeks to include in the putative Amended Complaint and on which it bases its putative claim for punitive damages claim. (Compare Doc. 49 at 2-5 with Doc. 112-2 at 9-15, 21-23.)  For example, in its Motion to Amend the Scheduling Order, Plaintiff claimed that Defendants had no formula, Defendants had a history of 'reactive loads,' Defendants' [sic] failed to warn of reactive loads, that Defendants [sic] manufacturing practices violate statutory feed requirements, Defendants failed to clean its tanks, that Defendants did not dispose of the contaminated and adulterated Mix 30, Defendants' product failed to comply with the product tag, and that 'Defendant to dump additional ingredients in the tank and sell the contaminated Mix 30 without any notice to the customers and without regard to the health of the cattle to which it would be fed.' (Doc 49 at 2–5.)

(Doc. 123, at 5.)  Thus, Defendants argue, "Plaintiff has been aware of the material facts contained

9

in the putative Amended Complaint and that form the basis of its punitive damages claim for far more than '45 days,' and, instead, has been aware of almost all, if not all, of the alleged material facts for more than one year.  (*Id.*)

Plaintiff replies that the memorandum in support of its May 6, 2024, motion to amend merely "summarize[d] what [Plaintiff] learned of Defendants' manufacturing processes, contaminated tanks, and failure to comply with the Mix 30 product tag during depositions conducted from February 19-21, 2024 and details the additional discovery [Plaintiff] intended to conduct in light of those revelations."  (Doc. 124, at 1-2 (citing Doc. 49, at 4-5).)  Even so, Plaintiff continues that this motion did not "state an intention [by Plaintiff] to assert a punitive damages claim, though it did indicate that '[t]he additional discovery required may also impact the damages sought by [Plaintiff].'"  (*Id.*, at 2 (citing Doc. 49, at 5).)  Plaintiff argues that it thereafter engaged in additional discovery, tested the Mix 30 samples, and served its expert reports, which culminated in the filing of Plaintiff's "Motion for a New Deadline for Motions to Amend" on January 21, 2025, to include additional facts and assert a claim for punitive damages.  (*Id.*, at 2 (referencing Doc. 82).)

Plaintiff acknowledges, however, that the Court <u>denied</u> the request for a new motion to amend deadline <u>on January 21, 2025</u>, while encouraging Plaintiff to file a motion to amend addressing the standards under Fed. R. Civ. P. 15 and 16.  (*Id.*)  Significantly, in Plaintiff's January 2025 "Motion for a New Deadline for Motion to Amend," Plaintiff stated that one of the reasons it was seeking to have the motion to amend deadline extended was so it could amend its claims "to assert a claim for punitive damages." (See Doc 82 at 1.)  Thus, by <u>Plaintiff's own admission, it had made the decision to move to add a claim for punitive damages by January 21, 2025, at the latest</u>.  (Doc. 82, at 1.)  Plaintiff did not, however, file the present motion to amend until May 9, 2025.  (Doc. 112.)

In the present motion, Plaintiff alleges that Defendants, although aware, failed to advise the

10

Holcomb plant that it was manufacturing reactive loads or that ammonia, toxins, and/or or bacillus existed in its manufacturing tanks. (*Id.*, at 6.) Plaintiff asserts that the Holcomb plant manager first learned of this during his deposition,

> indicating Defendants' concealment, and careless, willful and wanton disregard for their customers and the animals to which their toxic Mix 30 is fed. The Holcomb plant manager's deposition also revealed that Defendants' [sic] have never emptied or cleaned the Holcomb manufacturing tanks since they were brought on line in 2013, despite statutory and regulatory requirements to do so. Worse, Mix 30 sludge and remnants from another Kansas plant that was being shuttered were trucked to the Holcomb facility and placed in the Holcomb tanks at the commencement of their operation.

(*Id.*) This language is, however, taken virtually verbatim from Plaintiff's January 21, 2025, "Motion for a New Deadline for Motions to Amend." (*See* Doc. 82, at 4-5.) Thus, Defendants argue, it is disingenuous for Plaintiff to infer or argue that facts related to these issues were learned by Plaintiff in the 45 days preceding the filing of the present motion. (Doc. 123, at 6.) The Court agrees.

According to Defendants, "[t]he only two matters from the last 45 days that Plaintiff has identified is the deposition of the Stafford County Flour Mill corporate representatives and the FERA test reports." (*Id.*) Plaintiff argues key information as learned in the most recent depositions. Plaintiff points to the March 2025 deposition of Pat Collins, Defendants' corporate representative, who testified that reactive loads can be prevented and that Defendants advised their dealers to monitor pH levels while the Mill's corporate representative testified in April 2025 that Defendants did not provide this information. ((Doc. 112, at 7; Doc. 112-6, at 42-45.) Plaintiff asserts that this testimony is "unquestionably material" to its proposed punitive damages claim. (Doc. 124, at 3.)

As for the FERA testing results provided to Plaintiff on March 19, 2025, Defendants contend Plaintiff has failed to "identify anything contained in the test results that was necessary or even significant to its request for punitive damages." (*Id.*)

> Notably, Plaintiff, either in the Motion or the putative Amended Complaint, does not identify any bacteria or other microbe identified

11

> in this testing as having caused injury to its cattle. In fact, out of 137 paragraphs contained in the putative Amended Complaint, only one paragraph even references the FERA testing. (Doc 112-2, [proposed Amended Complaint] at ¶ 62.) Moreover, the main effect of this paragraph appears to be to undercut Plaintiff's claim in the proceeding [sic] paragraph that Defendants did not adequately investigate "reactive loads." (Id. at ¶ 61.)

(*Id.*) Thus, Defendants argue, Plaintiff "did not just suddenly, in the last 45 days, become aware of the alleged underlying facts supports [sic] the additional allegations and punitive damage claim contained in the putative Amended Complaint as Plaintiff claims in an attempt to meet its burden to show good cause for its delay in filing for leave to amend until this late date, weeks before the close of discovery." (*Id.*, at 7-8.) Rather, Defendants continue, the circumstances presented in Plaintiff's motion establish that Plaintiff's proposed punitive damages claim "comes much too late for Plaintiff to be able to show good cause … ." (*Id.*, at 8.)

Plaintiff replies that Defendant's assertion that Plaintiff failed to identify anything contained in the FERA test results as "necessary or even significant" to the punitive damages claim, "completely misses the point." (Doc. 124, at 3.) According to Plaintiff,

> [t]he FERA documents demonstrate that Defendants were concerned enough about reactive loads to seek extensive testing, and yet they made no effort to warn their dealers and customers of reactive loads. This evidence is also unquestionably material to [Plaintiff's] punitive damages claim.

(*Id.*, at 3-4.)

While this testimony is "unquestionably material" to Plaintiff's proposed claim for punitive damages, the Court finds that this information is not <u>determinative</u> of whether such a claim should be allowed. As discussed above, even without the FERA test results, Plaintiff clearly had information to support amending its Complaint to include a claim for punitive damages <u>months</u> before this deposition occurred.

The process for asserting a claim for punitive damages in federal court differs from the

process in Kansas state courts. "While the Kansas statute, K.S.A. 60-3703, prohibits a plaintiff from pleading punitive damages without leave of court supported by the evidence," the Federal Rules of Civil Procedure "require [the plaintiff] to assert such claim and allow amendment to assert such a claim without an evidentiary showing in support of the claim." *Estate of Ferrell,* 2024 WL 3890144, at *3 (citing *D.M. by & through Morgan v. Wesley Med. Ctr. LLC*, No. CV 18-2158-KHV, 2019 WL 2448574, at *5 (D. Kan. June 12, 2019) (discussing conflict between Fed. R. Civ. P. 8(a)(3) and K.S.A. 60-3703)). Therefore, pursuant to the federal rules, Plaintiff did not need to "wait until they have 'established that there is a probability that the plaintiff will prevail on the claim pursuant to K.S.A. 60-209,' as required by K.S.A. 60-3703, before seeking leave to amend." (*Id.*) In other words, Plaintiff should have moved to amend in a more timely manner.

Tellingly, Plaintiff previously argued Defendant failed to warn of reactive loads as early as May 2024. (*See* Doc. 49, at 3 wherein Plaintiff contends it "learned that Defendants have had a history of what they term 'reactive loads,' a circumstance that was unknown to [Plaintiff] at the time it purchased the Mix 30 (and of which Defendants failed to warn).") Thus, Defendants argue, "unless Plaintiff is claiming that its previous allegations were baseless, Plaintiff was aware of the alleged facts supporting the failure to warn allegations long before it took Stafford County Flour Mill's deposition." (Doc. 123, at 7.)

Under these circumstances, the Court finds that Plaintiff has not established good cause, pursuant to Fed. R. Civ. P. 16, as to why the motion to add a claim for punitive damages did not occur in a more timely manner upon learning information to support the claim. Rather, Plaintiff waited until the filing of the present motion in May 2025 despite the Court having encouraged Plaintiff to move to amend on more than one occasion, most recently in January 2025, some 3 ½ months prior to the motion being filed. Plaintiff has not met its burden under Rule 16 and, as such, its motion is **DENIED**.

B.      Rule 15(a).

Because the Court has determined that Plaintiff failed to establish good cause to be allowed to amend the Complaint after the expiration of the scheduling order deadline under Rule 16, the Court need not discuss the standards for amending the Complaint under Rule 15.  *See Estate of Ferrell*, 2024 WL 3890144, at *3.  Even so, the Court will briefly address the substance of such an analysis.

Leave sought should be freely given the absence of "undue delay, bad faith, dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  *See also Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993) (citation omitted).  "The proposed pleading is then analyzed using the same standard as a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Causer v. Somers*, No. 18-1221-JWB-GEB, 2020 WL 6742790, at *8 (D. Kan. Nov. 17, 2020).  "[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Williamson v. United Parcel Service, Inc.*, 2020 WL 1638063, at *2 (D. Kan. April 2, 2020) (citation omitted).

To withstand dismissal, a complaint or amendment need only make a statement of the claim and provide some factual support.  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)).  "It does not matter how likely or unlikely the party is to actually receive such relief, because for the purposes of dismissal all allegations are considered to be true." *Williamson*, 2020 WL 1638063, at *2 (citing *Twombly*, 550 U.S. at 556).  In other words, applying this standard, "the court must accept as true all well-pleaded factual allegations and view them in the light most favorable to the pleading party." *Carefusion 213, LLC v. Professional Disposables, Inc.*, No. 09-2626-KHV-DJW, 2010 WL 4004874, at *5 (D. Kan. Oct. 12, 2010).

The proposed amendment should be found futile only if the court finds "the proposed claims do not contain enough facts to state a claim for relief that are plausible on their face or the claims otherwise fail as a matter of law." *Id.* (citing *Raytheon Aircraft Co. v. U.S.*, 501 F. Supp. 2d 1323, 1327 (D. Kan. 2007).) The party opposing the amendment has the burden of showing the proposed amendment is futile. *Williamson*, 2020 WL 1638063, at *2 (citing *Layne Christensen Co. v. Bro-Tech Corp.*, No. 09-CV-2381-JWL-GLR, 2011 WL 3847076, at *5 (D. Kan. Aug. 29, 2011)).

Defendants' lone argument in opposition to Plaintiff establishing good cause under Rule 15 is undue delay – essentially the same argument they make as to Rule 16 analysis, *supra*: "For essentially the same reasons set forth with respect to Plaintiff's inability to establish good cause, Plaintiff's Motion should be denied based on undue delay." (Doc. 123, at 9.) Because Plaintiff cannot establish good cause for the delay under Rule 16, it follows that good cause has not been established under Rule 15. *See generally Estate of Ferrell*, 2024 WL 3890144. Plaintiff's motion is, therefore, **DENIED**.

**IT IS THEREFORE ORDERED** Plaintiff's Motion for Leave to File Amended Complaint (Doc. 112) is **DENIED**.

IT IS SO ORDERED.

Dated this 18th day of June, 2025, at Wichita, Kansas.

/s/ Brooks G. Severson
Brooks G. Severson
U.S. MAGISTRATE JUDGE