IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

SLASH F. CATTLE COMPANY, LLC,

        Plaintiff,

v.                                                                      Case No. 23-1197-JWB

AGRIDYNE, LLC, *et al.*,

        Defendants.

## MEMORANDUM AND ORDER

This matter came before the court on a *Daubert* hearing that took place on December 18–19, 2025, regarding Defendants' motions to exclude expert testimony from three of Plaintiff's experts. (Docs. 140, 142, 145.) At the hearing, the court denied Defendants' motions to exclude Dr. Adam C. Fahrenholz and Mr. Steve Stratford based on the testimony at the hearing. (Docs. 161, 162.) However, after hearing all testimony, the court took the motion to exclude Dr. Nick Henning under advisement. (Doc. 162.) For the reasons set forth herein, Defendants' motion to exclude Dr. Henning is DENIED IN PART AND GRANTED IN PART. As a result of this ruling, Defendants' motion for summary judgment (Doc. 144) is DENIED.

**I.    Facts**

This court has expounded the basic facts of this case previously but will briefly repeat them here. This case centers on the product known as Mix 30, a liquid cattle protein supplement created and marketed by Defendants that Plaintiff claims caused extensive injury and death to Plaintiff's cattle herd. Plaintiff asserts claims for negligence, breach of warranties, strict liability, fraud, and negligent misrepresentation. (Doc. 135.)

Dr. Nickolas Henning is the owner and operator of Heartland Veterinary Center in Ness

1

City, Kansas. His veterinary practice is a mixed animal practice, but he mostly cares for large animals. Dr. Henning also serves as the primary veterinarian of the Winter Livestock auction barn, which sells beef cattle in Dodge City, Kansas. In his practice, he is the primary treating veterinarian at the Slash F Ranch and had been treating the Slash F Ranch herd since 2016.

In fall 2022, the Kansas plains were experiencing a severe drought and Slash F looked for alternative protein sources to conserve cattle feed reserves. Ross Fisher, the owner and sole member of Slash F Cattle Company, LLC, worked with Dr. Henning to identify Mix 30 as a potential means to supplement his cattle herd's nutrition during the drought. At the hearing, Dr. Henning testified that the cattle in the Slash F herd were still in excellent shape even with the drought conditions. Mix 30 was fed to the cattle at Slash F in open top tanks, where the cattle could ingest the feed in a free choice manner.

On December 22, 2022, Mr. Fisher called Dr. Henning stating that he saw a bull become incapacitated and start having seizures in lateral recumbency almost immediately after drinking Mix 30. This bull died 30–40 minutes later. That same day, Mr. Fisher found a different cow that was also incapacitated, laterally recumbent, and seizing. Dr. Henning, initially believing that the issue could be nitrate toxicity or urea toxicity, told Mr. Fisher to orally give the cow as much vinegar as possible. Although this cow initially responded to this treatment, she died later that same night. Given that Dr. Henning was the veterinarian for the herd, he began investigating the potential causes of this situation. His initial, operational hypothesis for the cause of the behavior was nitrate toxicity, which often is a result of cattle ingesting fertilizer. Dr. Henning sent some blood and ocular fluid samples to a reference laboratory at Kansas State University along with a sample of Mix 30. This lab is run by Dr. Steve Ensley, and Dr. Henning used this lab frequently

for tests.[1]  The initial results did not show any increased nitrates, so Mr. Fisher allowed the cattle to return to feeding on Mix 30.

In early January 2023, several pregnant cows in the Slash F herd began to abort the calves they were carrying.  On January 4, Dr. Henning received a call from Dr. Ensley.  He reported that the Mix 30 sample had been sent to the toxicology department at Iowa State University and the test results showed that Mix 30 had no urea present, yet showed 7400 ppm of ammonia.  Upon retesting, the sample again showed no urea and ammonia at 6800 ppm.  Although the cattle in the Slash F herd had been successfully feeding on Mix 30 for approximately 30 days prior to the first incident, the ranch had received a fresh shipment of Mix 30 within a day before the first instance of the bull being incapacitated, seizing, and ultimately dying.  After receiving this information, Dr. Henning changed his differential diagnosis to ammonia toxicosis and took the herd off Mix 30.  Since that point, those cows from the Slash F herd that were exposed to Mix 30 have suffered difficulty maintaining good health and have struggled to calve properly.

In June 2023, Plaintiff filed suit against the producers of Mix 30.  Defendants removed to this court in September 2023.  (Doc. 1.)  Given that Dr. Henning was the treating veterinarian, he was retained to offer his firsthand experience working with the Slash F herd and offer his opinions as to the cause of the herd's behaviors and maladies.  In his initial report, Dr. Henning states that Slash F cattle ingesting Mix 30 with high ammonia content caused immediate damage to an otherwise healthy herd and that "sublethal tissue damage that has been done to the kidneys and liver of the affected animals is irreversible.  The extraordinary amount of undue stress that the toxic Mix 30 has placed on these animals will ultimately shorten their productive lifespans and severely limit performance." (Doc. 141-3 at 5.)  Dr. Henning later filed a supplemental report after

---

[1] Dr. Steve Ensley did not present testimony at the *Daubert* hearing, although Plaintiff proffered that he would be presenting his findings at trial as a fact witness rather than a retained expert.

discovery had closed, in which he adds an additional opinion that mycotoxins have been detected in Mix 30, and that "multiple toxins, as well as NH3 ammonia gas, caused immunosuppression and damage to multiple organ systems within the animals consuming it." (Doc. 141-4.) After the close of discovery, Defendants filed *Daubert* motions against three of Plaintiff's experts, Dr. Nickolas Henning, Dr. Adam C. Fahrenholz, and Mr. Steve Stratford, seeking to exclude their testimony under Federal Rule of Evidence 702. (Docs. 140, 142, 145.) Additionally, Defendants filed a motion for summary judgement based on Plaintiff being unable to meet its burden of proof should any of Plaintiff's expert testimony be excluded. (Doc. 144.) Although the court denied the motions to exclude Dr. Adam C. Fahrenholz and Mr. Steve Stratford based on the testimony at the *Daubert* hearing, the court took the motion for Dr. Henning under advisement. (Docs. 161, 162.)

**II.     Standard**

Generally, district courts have broad discretion to determine whether a proposed expert may testify. *United States v. Nichols*, 169 F.3d 1255, 1265 (10th Cir. 1999). Federal Rule of Evidence 702, which controls the admission of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of expert testimony bears the burden of showing the expert testimony is admissible. *Hampton v. Utah Dep't of Corr.*, 87 F.4th 1183, 1201 (10th Cir. 2023). "First, the court determines whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion." *Charbonneau v. Mortg. Lenders of Am. L.L.C.*, No. 18-CV-02062-HLT, 2021 WL 84169, at *2 (D. Kan. Jan. 11, 2021). After determining an expert

is qualified, "the district court must satisfy itself that the testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (quoting *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)). Generally, a district court should focus on a proffered expert's methodology and "not on the conclusions that they generate." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). However, "rejection of expert testimony is the exception rather than the rule." *Laber v. Austin*, 643 F. Supp. 3d 1242, 1246 (D. Kan. 2022). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### III. Analysis

As with all experts, the court must initially determine if Dr. Henning is generally qualified to offer his opinions on the impact of toxic feed to the Slash F cattle herd. Given Dr. Henning's experience running the Heartland Veterinary Center, his practice that focuses on treating large animals, and his veterinary education, the court is convinced that Dr. Henning has sufficient technical and medical knowledge to opine on diagnosing the cause of the potential injury to the Slash F cattle herd. He has numerous years of experience in the field of veterinary care and is qualified to offer opinions derived from his own differential diagnosis of treating the Slash F herd.[2] Even though he does not have any specific specialty in toxicology, he still possesses training and skills in diagnosing potential causes of toxicosis in cattle. *Quinton v. Farmland Indus., Inc.*, 928 F.2d 335, 337 (10th Cir. 1991). So long as a medical expert stays "within the reasonable confines

---

[2] "'Differential diagnosis' refers to the process by which a physician rules in all scientifically plausible causes of the plaintiff's injury. The physician then rules out the least plausible causes of injury until the most likely cause remains . . . The remaining cause is the expert's conclusion." *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1209 (10th Cir. 2002) (internal quotations and citation omitted).

of his subject area," the Tenth Circuit has held a lack of specialization does not affect the admissibility of that opinion, but only its weight. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (citing *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1520 (10th Cir. 1996)). Thus, Dr. Henning's credentials and education satisfy the court that he has sufficient technical and specialized knowledge to qualify him as an expert.

Moving to the arguments raised in the *Daubert* motion, Defendants move to exclude Dr. Henning's opinions in his supplemental report for being offered out of time, move to exclude his opinions on mycotoxins and bacillus as being unreliable, and move to exclude his causation opinions on ammonia toxicosis as unreliable. (Doc. 141.) The court will address each argument in turn.

First, regarding the argument that Dr. Henning's August 2025 supplemental report was untimely, the court finds that the out-of-time disclosure is justified by the fact that Dr. Henning updated his opinions after reviewing discovery in the case and is therefore harmless. "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (internal citation omitted). In so finding that the supplemental report is harmless, the court, in exercising its discretion, must follow the four factor test used in this circuit and analyze, "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002). In reviewing Dr. Henning's supplemental report from August 2025, the one-page supplemental report attempts to add an opinion about mycotoxins and how "multiple toxins" reacted with the gaseous ammonia in Mix 30 to have an

immunosuppressant effect on the Slash F cattle herd. (Doc. 141-4.) Rule 26 "permits supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report." *Minebea Co. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005). It is true that Dr. Henning's mycotoxin opinions were not in his expert report, and he first introduced his opinions that mycotoxins or bacillus could have reacted with ammonia to injure the cattle in his deposition that took place in December 2024. (Doc. 141-2 at 23–25.) At the time of his deposition, there may have been some prejudice to the Defendants; however, over 12 months have passed and communications between the parties make it clear that Defendants not only realized that these opinions had been added, but Defendants also wanted Dr. Henning to file a supplemental report with his new opinions at the end of December 2024. (Doc. 141-4.) The large amount of intervening time between Dr. Henning first suggesting that mycotoxins and bacillus could have been a cause of injury to the herd and the present time has given Defendants more than enough opportunity to cure any prejudice or surprise from Dr. Henning adding new pathology determinations. The court is concerned that Dr. Henning took nearly 8 months to file a one-page supplemental report, but it also finds that this new testimony would not disrupt the trial and that Plaintiff has not overtly acted in bad faith or willfulness. Thus, Dr. Henning's untimely supplemental disclosure under Rule 26(a) is harmless.

Second, Defendants move to exclude as unreliable Dr. Henning's opinions that the fungal mycotoxins and bacillus bacteria present in Mix 30 contributed to the Slash F herd's injuries. The court agrees such opinions are unreliable and excludes them. While the court has previously determined that Dr. Henning is qualified to offer opinions based on his differential diagnosis of toxicosis, this conclusion, based on the record before the court, does not extend to his ability to opine on the effects of mycotoxins or bacillus on the Slash F herd. Both in Dr. Henning's

supplemental report and deposition testimony, he was unable to identify harmful levels of exposure. Further, the record is absent regarding Dr. Henning's methodology and data analysis used in coming to his conclusion. *See Daubert*, 509 U.S. at 595 (explaining that district courts should focus on a proffered expert's methodology). This is in stark contrast to Dr. Henning's initial report where he thoroughly and methodologically opines on the health impacts of the Slash F cattle ingesting Mix 30 with high ammonia content. (Doc. 141-3.) Thus, while Dr. Henning's supplemental report's untimeliness was deemed harmless, it is nevertheless unreliable because it is devoid of methodology, lacks sufficient factual foundation, and fails to apply or even mention generally recognized principles regarding the effects of mycotoxins and bacillus on the Slash F herd. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999) ("Under *Daubert*, 'any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.'"); *Foster v. USIC Locating Servs., LLC*, 2018 WL 3757577, at *3 (D. Kan. 2018) (holding expert's opinion unreliable because it lacked "a sufficient factual foundation"). The court therefore finds that Dr. Henning's opinions related to mycotoxins and bacillus contamination of Mix 30 and its effect on the Slash F herd would not assist and, instead, would likely confuse a jury. *See Schulenberg*, 911 F.3d at 1282. Accordingly, the motion to exclude Dr. Henning's mycotoxins and bacillus opinions is granted.

Third, Defendants contend that Dr. Henning cannot offer causation testimony to connect cattle ingesting Mix 30 to the ammonia toxicity injury which the Slash F herd allegedly suffered. Defendants first contend that Dr. Henning cannot testify to general causation—that is, whether ammonia toxicity is capable of causing the particular injury suffered by the Slash F herd—because he is a clinical practitioner rather than an epidemiologist or toxicologist. And second, Defendants contend that Dr. Henning cannot conclude that the specific cause of the Slash F herd injury was

Mix 30 because he relies on laboratory tests that he did not personally run.

Regarding the ammonia toxicity general causation issue, Defendants are correct that a "[p]laintiff must first demonstrate general causation because without general causation, there can be no specific causation." *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881 (10th Cir. 2005). However, the court is convinced that Dr. Henning has sufficient basis to conclude that ammonia toxicity can cause the injuries seen in the Slash F herd based on his own experience treating animals and based on the evidence presented at the *Daubert* hearing. Dr. Henning testified at the *Daubert* hearing that gaseous ammonia would immediately enter the bloodstream from the rumen in cattle and then cross the blood-brain barrier. This would induce seizure and death. Additionally, he testified that the detrimental effects of ammonia on the kidneys and livers could result in the spontaneous abortions of calves in pregnant cows and would also explain the detrimental long-term effects on the herd. Defendants spent a large amount of their briefing and time at the *Daubert* hearing arguing that Dr. Henning misunderstands the amount of ammonia required to cause the injuries he describes and that his opinion that any gaseous ammonia can cause damage to cattle is contrary to generally accepted veterinary thresholds. However, nothing presented to the court shows that ammonia toxicity is such a blatantly incorrect diagnosis as to render Dr. Henning's methods and conclusions unreliable under Rule 702. Although Defendants disagree on the methodology and conclusions Dr. Henning reaches, these topics are best left for development in cross examination.

Additionally, Defendants argue that Dr. Henning is a conduit for otherwise inadmissible hearsay because he bases his opinions on data and conclusions he received from Dr. Ensley at Kansas State University. This argument strains credulity. It is true that an expert cannot simply exist as a mouthpiece for another expert to prevent the opposite party from being able to cross-

examine that expert and determine the underlying methods. *See TK-7 Corp. v. Est. of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993). However, Federal Rule of Evidence 703 explicitly allows experts to rely on facts or data "that the expert has been made aware of … [i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. Under Defendants' proposed framework, they ask the court to prevent Dr. Henning from testifying on facts he received from Dr. Ensley. However, Dr. Henning testified that he frequently uses Dr. Ensley's laboratory for testing, and most veterinarians frequently rely on external testing for diagnosis. Defendants' proposed framework would functionally require every veterinarian or doctor to run their own tests and never be able to rely on any external laboratory reports. This is explicitly the sort of argument that the authors of Rule 703 sought to avoid.[3] Moreover, according to proffer from Plaintiff's counsel, Dr. Ensley is being called as a fact witness, so Dr. Henning will not be used as a conduit for hearsay. Although Defendants disagree on the methodology and conclusions Dr. Henning reaches, these topics are best left for development in cross examination. The court is sufficiently satisfied with the general pathology of ammonia toxicity that Dr. Henning intends to offer and thus satisfy a Rule 702 threshold *Daubert* determination regarding general causation on ammonia toxicity in the Slash F herd.

Regarding the specific causation issue, Defendants argue that Dr. Henning's diagnosis suffers from "the logical fallacy of *post hoc ergo propter hoc*—that because the cattle became ill

---

[3] "The third source [of facts and data] contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception. In this respect the rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." Fed. R. Evid. 703 (advisory committee's note to 1972 proposed rules).

after eating the feed, the feed must have caused the illness." (Doc. 141 at 13.) Simple temporal association may not be sufficient to prove causation; nevertheless, circumstantial evidence can be used to draw factual conclusions in a civil setting. *Lenherr v. NRM Corp.*, 504 F. Supp. 165, 168 (D. Kan. 1980). "Although a fact is not proven by circumstances which are merely consistent with its existence, circumstantial evidence in a civil case need not rise to that degree of certainty which will exclude every reasonable conclusion other than the conclusion sought to be established." *Id.*

In a similar way here, the court is convinced that Dr. Henning's observations and diagnosis of the Slash F herd are sufficiently reliable to allow a jury to infer a relationship between Mix 30 and the Slash F herd's injury. At the hearing, Dr. Henning testified that he had worked with the Slash F herd since 2016, and that Slash F maintained a very efficient cow herd within the top 5% of the clientele with whom he worked. After the events of December 2022, the cattle exposed to Mix 30 had persistent health difficulties as compared to the remainder of the herd. Importantly, the health issues that the Slash F herd has and is dealing with after ingesting Mix 30 goes beyond a mere temporal association as Defendants seem to suggest. Rather, animals weighing hundreds of pounds were collapsing and seizing approximately 10 minutes after ingestion of the Mix 30 substance, of which a new shipment had just recently arrived and been distributed to cattle feeding locations. Moreover, the damage extends far beyond the immediate deaths within the Slash F herd. Beyond the portion of the herd that promptly died, the surviving cattle continued to suffer severe organ damage, manifesting in convulsions, muscle spasms, limping, trembling, and lack of coordination. Many cows aborted their calves, delivered stillborn calves, or produced offspring with significant injuries, and birth rates allegedly plummeted from approximately 95% to below 65%. The surviving animals remained unable to thrive, with many dying from congestive heart failure caused by the organ damage, and Slash F was forced to sell affected cattle far below their

value.  These results contrast sharply with the performance of that part of the Slash F herd that was not exposed to Mix 30, which the testimony suggests continued to perform well and maintain good health.  When combined with the laboratory analyses that show the high levels of ammonia in Mix 30, this collection of facts goes far beyond mere temporal proximity and is sufficient to allow a jury to consider whether Mix 30 caused the harm to the Slash F herd.

Additionally, this is not some quixotic struggle where Dr. Henning campaigned against Mix 30 and sought to affirm some bias.  Rather, Dr. Henning initially believed that nitrate toxicity caused the symptoms in the Slash F herd and only changed his diagnosis to Mix 30 being the root cause after receiving reports from Dr. Ensley at Kansas State University.  While Defendants may have valid concerns about whether Dr. Henning incorrectly identified ammonium rather than ammonia, these are arguments which can and should be developed on cross examination rather than rising to the level of exclusion under Rule 702.  The fact that Defendants disagree with Dr. Henning's conclusions does not mean that they are insufficient to survive Rule 702 or that they are unhelpful to a jury.  Therefore, Defendants' motion to exclude Dr. Henning's testimony on ammonia toxicity and causation is denied.

Given that the court has denied Defendants' motions to exclude the expert testimony of Dr. Adam C. Fahrenholz and Mr. Steve Stratford and denied the motion to exclude Dr. Henning, in part, the court finds that Plaintiff has proffered sufficient expert testimony to survive Defendant's motion for summary judgement. (Doc. 144.)  This motion was predicated on Plaintiff's failure to meet their burden of proof once experts were excluded.  Since none were excluded, the motion for summary judgement is denied.

### IV.   Conclusion

Therefore, Defendants' motion to exclude the testimony of Dr. Nick Henning (Doc. 140)

is DENIED as to Dr. Hennings opinions related to ammonia toxicosis and GRANTED as to Dr. Henning's opinions related to mycotoxins and bacillus contamination of Mix 30. Defendants' motion for summary judgement (Doc. 144) is DENIED.

IT IS SO ORDERED. Dated this 30th day of January, 2026.

                                                 s/ John W. Broomes
                                                 JOHN W. BROOMES
                                                 CHIEF UNITED STATES DISTRICT JUDGE